Kenneth SAIN, Leroy Camel, Jr. and Howard W. Carroll, Plaintiffs,

v.

Christopher NAGEL, Robert Bach, Molten Metal Technology, a Delaware Corporation, and John T. Preston, Defendants.

No. 95 C 2247.

United States District Court,
N.D. Illinois,
Eastern Division.

March 11, 1998.

Brian D. Roche, Gary Steven Caplan, Sachnoff & Weaver, Ltd., Chicago, IL, for plaintiffs.

Charles S. Bergen, Brooke A. Adams, Grippo & Elden, Chicago, IL, for Defendants Christopher Nagel, Robert Bach.

Paula Enid Litt, Schopf & Weiss, Chicago, IL, P. Sabin Willett, Sarah E. Mizner, Bingham, Dana & Gould, Boston, MA, for Defendants Molten Metal Technology, John T. Preston.

## MEMORANDUM OPINION AND ORDER

ZAGEL, District Judge.

### I. Background

This case is about the maneuvers of men who envision the possibility of transforming an idea into a fortune. In the early 1980s, defendants Robert Bach and Christopher Nagel met at Wayne State University in Michigan where Bach was an Organic Chemistry professor and Nagel was a student. In 1986, Bach and Nagel (the "Inventors") patented a process that they invented for the destruction of hazardous waste. (U.S. Patent 4,574,714 and continuation-in-part patent 4,602,574) (the "Patents").

Plaintiff Kenneth Sain is an attorney with expertise in business and government. He also worked in the office of the Mayor of Chicago for several years. Plaintiff Howard

Carroll, an attorney, is Sain's law partner and a specialist in negotiations and problem solving. Carroll has also been serving as an Illinois State Senator for more than 24 years. Plaintiff Leroy Camel is a businessman who helps inventors market and commercialize their products. Camel's son, a friend of Nagel's in college, introduced Camel and Nagel.

Around 1986, Camel and the Inventors began discussing ways to commercialize the Patents. Camel introduced the Inventors to Sain and Carroll. Camel, Sain and Carroll ("Plaintiffs") and the Inventors agreed that technical, governmental and social processes needed to be engaged to render the patents commercially viable, and they decided to work together towards this goal. The parties did not have a written agreement at this time, but it was understood that plaintiffs would receive some compensation for their services.

In September 1987, Plaintiffs and the Inventors executed the Exotherm Incorporation Agreement drafted by an attorney at Carroll & Sain, Ltd., thereby creating Exotherm, Inc. for the purpose of commercializing the Patents and "design[ing], develop[ing], construct[ing] and operat[ing] a process for the destruction of hazardous waste." Exotherm Incorp. Agreement at 1. Between September 1987 and November 1989, Plaintiffs contacted government officials, investment bankers, corporations, and individuals to solicit interest in and development funds for the patented technology. Also, the Inventors and Plaintiffs attended numerous meetings and disseminated a business plan they had jointly prepared. However, they failed to gain financing to commercialize the Patents.

Now the plot thickens. Some time in 1989, Charles Harris, a venture capitalist interested in environmental technologies, contacted the Technology Licensing Office at the Massachusetts Institute of Technology ("MIT") and was introduced to John Preston, MIT's Director of Licensing. Preston told Harris that Chris Nagel, a doctoral candidate at MIT at that time, had invented a process for treating hazardous waste. Shortly thereafter, Harris met with Nagel and discussed the Patents.

In early November 1989, the Inventors decided to work with Harris, and they called Sain and Camel to tell them the news. Meanwhile, Harris formed Molten Metal Technology, Inc. ("MMT") for the purpose of commercializing the process of hazardous waste destruction described in the Patents. By November 6, 1989, Nagel knew that he would become an employee of MMT and receive stock options from the corporation. On November 8, 1989, Harris incorporated MMT as a wholly-owned subsidiary of H & H Venture Capital, Inc.—itself a wholly-owned subsidiary of Harris & Harris Group, Inc., a publicly-held company run by Charles Harris. At its inception, MMT had two directors: Harris and his business associate, Rick Childress. Harris provided MMT with $1,000,000 in initial capital.

On November 13, 1989, the Inventors engaged in a telephone conference call discussion with their attorney Anthony Carroll, John Preston of MIT, Gene Whittemeyer of MIT, and the Plaintiffs to discuss their intention to sell an option on the Patents to MMT.

On November 14, 1989, Harris & Harris Group, Inc. issued a press release announcing the formation of MMT for the purpose of commercializing the Nagel–Bach process for waste destruction and the acquisition of an option to purchase the Patents. The press release also announced that Harris would serve as the Chairman and CEO, Nagel as the company's President and Bach as its Vice–Chairman. On this date, Nagel and Bach began serving in these positions at MMT.

In December 1989, MMT, Bach and Nagel executed an Initial Technology Option Contract ("TOC" or "Option Contract") granting MMT the right to purchase the Patents and "certain know-how, processes" for $3 million. Under this TOC, the Inventors had to "use their best reasonable efforts to cause all of the shareholders of Exotherm ... to waive and release ... any ownership rights ... with respect to the Patents, the Technology...."

After the November 13, 1989 conference call, Plaintiffs and the Inventors began negotiating a settlement by which the they would

end their business relationship, Plaintiffs would release any rights they had regarding the Patents, and the Inventors would be free to commercialize their Patents through Harris and MMT. Sain represented the Plaintiffs, and Anthony Carroll represented the Inventors. The Inventors sent a final version of the Option Contract to Sain by January 5, 1990. Sain reviewed it and forwarded copies to Camel and Carroll.

Around April 12, 1990, the Inventors and the Plaintiffs executed the Settlement Agreement. By this agreement Plaintiffs agreed to release any claims in Exotherm and the Patents in exchange for the Inventors' promise to compensate them according to a formula set out in the agreement. But on May 29, 1990 MMT terminated its option without exercising it.

By an agreement dated May 31, 1990 the Inventors and MMT executed the Technology Assignment Agreement ("TAA") by which the Inventors assigned their interests in the Patents to MMT in exchange for MMT's promise to pay to them $4,000,000 according to a seven-year payment schedule.

Then in early June 1990, Harris withdrew from MMT. He resigned from the Board of Directors and withdrew his capital investment in the corporation. MMT retained approximately $137,517.20 of capital as of June 13, 1990. William Haney, who had invested $100,000 in MMT between November 1989 and March 1990, replaced Harris as the Chairman and CEO of the corporation. Preston replaced Bach as the Vice Chairman of the board, and Nagel remained on the board.

During the summer of 1990, Preston and Nagel negotiated a deal related to the Patents with the Travelers Insurance Company ("Travelers") in which Travelers tentatively agreed to invest $5,000,000 in MMT.

On October 12, 1990, MMT and the Inventors executed the amended TAA that reduced the Inventors' compensation for assigning their Patents to MMT from $4,000,000, as agreed upon in the TAA, to $1,500,000. Travelers financed MMT in the late fall of 1990.

Since June 1990, MMT has developed into a publicly-traded company that, *inter alia,* employs several hundred people, owns more than sixty patents, licenses and permits, and operates two commercial facilities for processing waste. The Inventors have not yet received the $1,500,000 due under the amended TAA. They have received two payments to date: $25,414 in April 1992 and $88,696.50 in April 1996 which they have placed in escrow pending a resolution of the claims presented here. The Plaintiffs have not received any payment related to the Patents thus far.

### *Procedure*

Plaintiffs filed a six-count amended complaint against the Inventors and MMT stemming from their business dealings and claiming that the Inventors owe them compensation pursuant to the Settlement Agreement. Specifically, Plaintiffs allege claims against the Inventors for a breach of the Settlement Agreement (Count I), fraud (Count II), and a breach of fiduciary duties (Count III). Plaintiffs allege three claims against MMT for civil conspiracy (Count IV), inducement of breach of fiduciary duties (Count V), and tortious interference with contractual relations (Count VI). The Inventors asserted three counterclaims against the plaintiffs for a violation of the Illinois Fair Invention Development Standards Act ("FIDSA" or "Act") (Count I), breach of fiduciary duties (Count II) and misappropriation of corporate opportunities (Count III).

Now the Inventors, MMT and Plaintiffs each move for summary judgment. The Inventors move for summary judgment on Counts I, II and III of the complaint. MMT moves for summary judgment on Counts IV, V and VI of the complaint. Plaintiffs move for summary judgment on the Inventors' counterclaims I and II. I consolidate these motions for review now.

### *Standard of Review*

A court grants summary judgment only "if the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether there are any genuine issues of material fact, the court will make all inferences in the light most favorable to the nonmovant. *Bartman v. Allis–Chalmers Corp.*, 799 F.2d 311, 312 (7th Cir. 1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## II. The Plaintiffs' Motion

Plaintiffs move for summary judgment on the Inventors' counterclaims I and II.

■ This case presents an issue of first impression regarding the applicability of the Illinois Fair Invention Development Standards Act, 815 ILCS 620/101 et seq. Plaintiffs move for summary judgment on grounds that the FIDSA does not apply here. The Inventors claim that the Act applies, the Exotherm Incorporation Agreement does not meet its requirements and therefore the agreement is void and all subsequent agreements between the parties, including the Settlement Agreement, are voidable under 815 ILCS 620/502. The portion of the FIDSA that the Inventors refer to, 815 ILCS 620/502, provides that

> Any contract for invention development services [1] which does not comply with the applicable provisions of this Act shall be void and unenforceable as contrary to public policy. . . .

Compliance with the Act, requires, *inter alia,* that "invention developers" make disclosures to "customers" [2] prior to any contract formation (815 ILCS 620/201, 202), express any agreement in writing and include notice provisions and mandatory terms in contracts for invention development services.[3] (815 ILCS 620/301, 302, 401, 402).

Plaintiffs contend that the Act does not apply to them because they did not meet the statutory definition of an "invention developer." An "invention developer" is "any person, firm, corporation, association or other entity that performs 'invention development services', *except . . . any person, firm, corporation, association or other entity that does not charge a fee for invention development services."* 815 ILCS 620/103(e) (emphasis added). Plaintiffs contend they never billed, charged or collected a fee (or even an expense reimbursement) from the Inventors or Exotherm for services they performed in connection with Exotherm. The Inventors allege that the shares of Exotherm stock that Plaintiffs received under the incorporation agreement constitute a "fee." The Exotherm Incorporation Agreement, governing the working relationship between the plaintiffs and the Inventors, does not explicitly use the word "fee." However, in paragraph 4 it provides Camel, Carroll and Sain with a total of 333.32 shares of Exotherm stock. Thus, Plaintiffs apparently received stock in exchange for agreeing to provide services.

Did this stock constitute a "fee"? The FIDSA defines a "fee" as including

> [A]ny payment made by the customer to [the invention developer] including reimbursements for expenditures made or costs incurred . . . but shall not include any payment made from a portion of the income received by a customer by virtue of invention development services performed. . . .

(815 ILCS 620/103(e)). In defining what constitutes a "fee" this section distinguishes the

---

**1.** "Invention development services" include "at least one of the following: (1) evaluation of the market potential of an invention; and (2) representation of an invention to potential distributors or to potential manufacturers of the invention." *815 ILCS 620/103(a).*

**2.** A "customer" includes "any person, firm, corporation, association, or other entity that is solicited by, inquires about or seeks the services of, or enters into a contract for invention development services with an invention developer." 815 ILCS 620/103(c).

**3.** For example, the Act requires that every contract include: (1) a distinctive cover sheet with a statutorily mandated notice to customers; (2) a full and detailed description of the services the invention developer will perform; (3) a statement of the fee to be charged; (4) a statement that the invention developer acts as a fiduciary to the customer; and (5) a statement of the expected date of completion of the invention development services.

situation where an inventor accepts invention development services from another person and promises to pay that person a portion of whatever income is earned by virtue of the services. Thus, the Act appears to draw a line between actual, direct payments of valuable consideration and promises to pay a percentage of future income. This interpretation is supported by the legislative history of the FIDSA which indicates that the Illinois legislature intended to protect inventors from persons who offer invention development services but fail to actually perform once they have been paid. During the third reading of the bill just before the Senate unanimously approved it, Illinois Senator Maragos described House Bill 691 as

> [A] bill to prevent frauds and abuses by many racketeers throughout the country ... these schemers take money of the people and don't do a darn thing for it and they give them false promises that they're supporting their invention and that they're going to prosecute their claims before the government in Washington.... In other words what this does in this particular contract [i.e., the contract required by Section 401, is that] *before the ... innocent public signs with these people, they have to list what's going to be done by ... and what they're paying the fees for.* (Emphasis added.)

This suggests that the Illinois legislature was primarily concerned with the person who offers to perform invention development services, demands and receives valuable consideration and then fails to perform. That scenario is distinguishable from the situation where a person offers to perform invention development services and agrees to be paid a portion of the income that the inventor re-ceives by virtue of those services, because if the person fails to perform or performs but fails to produce income, the person will not receive any payment.

Here, I find that the Exotherm stock constituted "payment from income" for the following reasons. At the time the Plaintiffs accepted the Exotherm stock and for the duration of Exotherm's existence, Exotherm was not generating any revenue. The sole purpose of Exotherm, Inc. was to develop and commercialize a single invention. Therefore, the stock lacked value when Plaintiffs accepted it apart from the potential, but uncertain, future success of the Patents. When MMT decided to invest $1,000,000 in the Patents the stock became valuable. If the Inventors had not joined forces with MMT, the Patents might never have been developed in which case Plaintiffs would have been left with worthless shares of stock. I find that by accepting stock in a new company that was not generating any revenue, Plaintiffs agreed to receive compensation based upon the corporation's potential income. Thus, the stock did not constitute a "fee," the Plaintiffs did not act as statutory invention developers and they were not subject to the FIDSA.[4]

The Inventors contend that Plaintiffs themselves expressed the opinion that the Exotherm stock was worth approximately $1,000,000 and that the amount due Plaintiffs under the Settlement Agreement satisfies the FIDSA's fee requirement. For the reasons discussed above, I conclude that even if Plaintiffs estimated the stock to be valued at $1,000,000, this amount could only represent a projection of what the future value would be if the Patents were developed. As for the

---

4. A caveat should be added to this discussion. It is possible that the Illinois Supreme Court will construe the FIDSA in the future and decide whether payment from income includes stock (or not). But for now, all we have is the language of the statute stating that a fee does not include payment from income. In drafting the FIDSA, the Illinois legislature provided numerous explicit provisions that show it defined terms specifically when it wanted to do so. *See, e.g.,* 815 ILCS 620/202 (setting out specific disclosures that invention developers must provide to customers); 815 ILCS 620/401 (containing fourteen subsections providing detailed contract require-ments). This leads me to speculate that the General Assembly may have purposely left the term "fee" vague so that courts would determine what constituted a fee on a case-by-case basis.

I also note that the FIDSA appears to contain internal inconsistencies regarding the compensation of invention developers. Specifically, section 620/103(e) excludes a person who does not charge a fee from the definition of "invention developer", but section 620/201 applies to every invention developer who charges "a fee or requires any consideration for his invention development services...."

amount due under the Settlement Agreement, paragraph 7(a) of this agreement provides that Plaintiffs are entitled to a portion of "the consideration actually received by them" from MMT or another third party. I find this language describes precisely that which the FIDSA excludes from the definition of a "fee", i.e., "payment from a portion of the income received." (815 ILCS 620/103(e)).

Summary judgment is granted in favor of Plaintiffs on the Inventors' first counterclaim.

### A. Counterclaim II: Breach of Fiduciary Duties by Plaintiffs

Plaintiffs also move for summary judgment on the Inventors' second counterclaim on the grounds that they could not have breached any fiduciary duties because no fiduciary relationship existed. The Inventors contend that there was either an inventor-invention developer fiduciary relationship based upon the FIDSA or an attorney-client fiduciary relationship, that Plaintiffs were the fiduciaries and that they breached duties owed based on their fiduciary status.

■ My conclusion that the FIDSA does not apply in this case rules out the existence of an inventor-invention developer relationship based upon the FIDSA. So, what about an attorney-client relationship? Ordinarily, an attorney-client relationship is a contract the parties expressly agree to enter into. The facts clearly demonstrate that no express attorney-client relation existed: there was no retainer agreement, no express request for or consent to the provision of legal services, and no payment of fees. However, the existence of an attorney-client relationship may be implied even in situations where no formal agreement exists and in the absence of mutual consent. *United States v. Evans*, 954 F.Supp. 165, 167 (N.D.Ill.1997) (quoting *Westinghouse Elec. Corp. v. Kerr-McGee Corp.*, 580 F.2d 1311, 1317 (7th Cir. 1978)). "A fiduciary relationship may result because of the nature of the work performed and the circumstances under which confidential information is divulged." *Westinghouse*, 580 F.2d at 1319. "But the professional relationship does not arise where one consults an attorney in a capacity other than as an attorney." *Id.*

■ The Inventors argue that the following facts demonstrate the existence of an attorney-client relationship between them and Sain and Carroll: (1) Sain stated that he and Carroll and Camel were "brought into this venture to bring to it a business and legal acumen"; (2) Plaintiffs provided legal services when they drafted the Exotherm incorporation agreement; (3) Sain sent letters to third parties in which he stated that "this firm represents" the Inventors; and (4) Plaintiffs never told the Inventors to seek independent counsel. Sain and Carroll present the following facts to demonstrate that no attorney-client relationship arose: (1) the Inventors only sought business advice from Plaintiffs, not legal advice; (2) Bach testified during a deposition that Sain's role was to identify venture capitalists; and (3) Sain advised the Inventors to seek outside counsel. Upon reviewing the record I found that the latter fact alleged by Plaintiffs is unsupported and that a genuine issue of material fact precludes summary judgment on the issue of whether an implied attorney-client relationship existed here.

### III. The Inventors' Motion

### A. Count I: Breach of Contract

■ In their breach of contract claim, Plaintiffs contend that the Inventors breached the terms of paragraphs 3 and 7 of the Settlement Agreement by failing to pay Plaintiffs their share of the $50,000 that the Inventors received from MMT to hold open the option period and the $114,110.50 they received thus far from the sale of the Patents. The Inventors move for summary judgment on the grounds that they cannot be found to have breached the Settlement Agreement because two conditions precedent to paying Plaintiffs have not yet been fulfilled: (1) the Inventors have not yet received full payment from MMT, and (2) the Patents' Allocated Value has not been determined. A finding that the agreement contained either of these conditions precedent and that Plaintiffs improperly failed to fulfill

one or both would preclude Plaintiffs' breach of contract claim.

 Did Plaintiffs fail to fulfill conditions precedent contained in the Settlement Agreement? Generally, a condition precedent is "one which must be performed before some right dependent thereon accrues, or some act dependent thereon is performed." Black's Law Dictionary (5th ed.) First, the Inventors submit that pursuant to paragraph 7 receiving full payment for the Patents is a condition precedent to compensating Plaintiffs. The relevant portion of paragraph 7 provides that "the Inventors shall pay to the Interested Parties, *out of the consideration actually received by them,* an amount equal to the greater of (i) [sic] $500,000 or (ii) one-sixth of the Allocated Value of the Patents...." (Emphasis added). The Inventors argue that this language means that they become obligated to pay Plaintiffs once they "actually receive" payment in full. Plaintiffs interpret this same language differently. Plaintiffs contend that the language of paragraph 7 clearly and unambiguously mandates immediate payment by the Inventors to Plaintiffs of their share of whatever consideration the Inventors have actually received whenever they receive it. Plaintiffs also point out that no part of the Settlement Agreement provides that the Inventors must receive full payment prior to compensating Plaintiffs. I find that the language contained in paragraph 7 is fairly susceptible to either the Inventors' or Plaintiffs' interpretation and thus "ambiguous," *Echo, Inc. v. Whitson Co., Inc.,* 121 F.3d 1099, 1105 (7th Cir.1997), and the settlement agreement as a whole does not address the issue of when payment to Plaintiffs becomes due. The parties do not offer other evidence to clarify this point, and, seeing none, I conclude that this is a factual question that may not be resolved on summary judgment.

Was a determination of the Allocated Value of the Patents a condition precedent to compensating Plaintiffs? The relevant portion of Paragraph 7 provides:

[T]he Inventors shall pay to [Plaintiffs] ... an amount equal to the greater of $500,000 or (ii) one-sixth of the Allocated Value of the Patents.... *The parties shall attempt to arrive promptly at the Allocated Value by negotiations in good faith, but if they are unable to do so, the Allocated Value shall be determined by an independent expert reasonably acceptable to both sides.* (Emphasis added).

I agree that this language sets forth a condition precedent: before the Inventors can pay the appropriate share of the Allocated Value of the Patents to the Plaintiffs, the parties must determine what that value is. The parties agree that they never explicitly negotiated the Allocated Value. But Plaintiffs claim that the failure to perform this condition should not interfere with their breach of contract claim because the $114,110.50 that the Inventors received thus far is undisputably part of the Allocated Value, and the Inventors prevented the performance of the condition precedent.

Pursuant to the well-established covenant of good faith and fair dealing that is implied in every contract absent express disavowal, both parties had a duty to use reasonable efforts to bring about the condition precedent at issue here. *Dayan v. McDonald's Corp.,* 125 Ill.App.3d 972, 979–80, 81 Ill.Dec. 156, 466 N.E.2d 958 (1st Dist. 1984) (quoting *Martindell v. Lake Shore Nat'l Bank,* 15 Ill.2d 272, 286, 154 N.E.2d 683 (1958)). Moreover, Illinois courts have observed that when a condition is peculiarly within the power of one party, the controlling party may attempt to avoid incurring any contractual obligation by refusing to bring about the relevant condition. But in such cases, the courts have held that the controlling party's discretion is limited by the implied covenant of good faith which requires the party to use reasonable efforts to bring about the condition. *Id.* at 990, 81 Ill.Dec. 156, 466 N.E.2d 958. Here, the Inventors received the payments for the Patents, and Plaintiffs had no way of knowing whether such payments were made unless the Inventors notified them or responded to their inquiries. The Inventors were peculiarly empowered to bring about the condition precedent at issue because they alone knew when the payments were made and unless they informed Plaintiffs that they had received such payments and agreed to negotiate the Allocated Value, such negotia-

tions could not occur as required by paragraph 7. Between April 1990 and April 1993, Sain repeatedly wrote to Nagel, Jacks and Kehoe to inquire whether the Inventors had received any payments, but he was unable to obtain a proper response. By their failure to notify Plaintiffs about payments actually received and to respond to Plaintiffs' inquiries, the Inventors obstructed fulfillment of the condition precedent. The Inventors have failed to provide evidence in support of their contention that Plaintiffs did not attempt to negotiate Allocated Value. The Inventors cannot now claim the failure of a condition defeats their own liability when they prevented actualization of the condition. *Osten v. Shah,* 104 Ill.App.3d 784, 786, 60 Ill.Dec. 497, 433 N.E.2d 294 (3d Dist.1982). Thus, the Inventors' motion for summary judgment on the breach of contract claim is denied.

### B. Count II: Fraud

Next, Plaintiffs allege that the Inventors fraudulently induced them to enter into the Settlement Agreement by omitting material information beforehand. The Inventors move for summary judgment on this fraud claim based on a lack of evidence that they made any material omissions with the intent of deceiving Plaintiffs or that Plaintiffs relied on any alleged omissions and suffered injury thereby.

■■■ In Illinois, the elements of common law fraud are: (1) a false statement or omission of material fact; (2) made by one person with the intent to induce a second person to act; (3) action by the second person in reliance on the statement or the omission; and (4) actual injury to the second person from that reliance. *Drobny v. Commissioner of Internal Revenue,* 113 F.3d 670, 679 n. 14 (7th Cir.), *cert. denied,* —— U.S. ——, 118 S.Ct. 303, 139 L.Ed.2d 233 (1997); *Lidecker v. Kendall College,* 194 Ill.App.3d 309, 314, 141 Ill.Dec. 75, 550 N.E.2d 1121, (1st Dist. 1990). In a business transaction, silence is not equivalent to fraud unless it is accompanied by deceptive conduct or the suppression of material facts causing actual deception. *Lagen v. Balcor Co.,* 274 Ill.App.3d 11, 17, 210 Ill.Dec. 773, 653 N.E.2d 968 (2d Dist. 1995) (citation omitted). At trial Plaintiffs

have the burden of proving the elements of fraud by clear and convincing evidence. *AMPAT/Midwest, Inc. v. Illinois Tool Works, Inc.,* 896 F.2d 1035, 1040 (7th Cir. 1990) (citation omitted).

■■■ First, were there any material omissions? Plaintiffs allege that the Inventors failed to disclose several material facts, primarily that: (1) the Inventors would assume officer and director positions in MMT; (2) the Inventors would receive salaries and options from MMT; (3) MMT incorporated on November 8, 1989; (4) the Inventors were negotiating with third parties regarding the sale of their technology; (5) the Inventors were "founders" of MMT; and (6) the Inventors would unilaterally reduce the sales price of the Patents.

Materiality is generally a question of fact. *Kleban v. S.Y.S. Restaurant Management, Inc.,* 929 F.Supp. 294 (N.D.Ill.1996). Accepting for purposes of this motion that the facts Plaintiffs refer to were material, I focus on whether they were impermissibly omitted as a matter of law. I begin by observing that the Inventors disclosed some information to Plaintiffs before the settlement by sending them a copy of the Option Contract with MMT in January 1990, about four months before the parties executed the Settlement Agreement.

*Facts # 1 and 2: The Inventors would assume officer and director positions in MMT and receive salaries and stock options.*

In the Option Contract, the Inventors revealed information about Nagel's anticipated role in MMT, including the fact that he would be employed by MMT in exchange for a salary, stock options and other benefits. Specifically this contract provides in relevant part:

> After the closing of the Technology Development Deal ... MMT (or its assignee) and Nagel shall enter into an employment agreement for a three-year term ... and Nagel shall be employed ... as the Chief Scientist or Vice President of Engineering of MMT ... and Nagel shall be entitled to receive a compensation package including ... cash salary, stock options ... compa-

rable to ... the Employer's five other most highly compensated employees....
Def. Ex. 3, Option Contract at ¶ 6(a).

In addition, the Inventors permitted the public disclosure that both Nagel and Bach would serve as MMT corporate officers in the Harris Press Release dated November 14, 1989 which announced: "Molten Metal Technology has named ... Christopher J. Nagel, ... as its President; and Dr. Bach as its Vice Chairman." Def. Ex. 23. It is not clear whether Plaintiffs knew about this press release at the time of settlement, but it was a public document that they had the ability to acquire any number of ways. Therefore, I find that Plaintiffs at least had constructive notice of the Inventors' roles as MMT officers. *Eckstein v. Balcor Film Investors,* 58 F.3d 1162, 1168 (7th Cir.1995) (court found investors had constructive notice, i.e., "no actual knowledge, but the ability to acquire knowledge by reasonably diligent inquiry," of alleged omissions in a fraud claim). I conclude that the Inventors gave Plaintiffs actual or constructive notice of all the facts described as numbers 1 and 2 except that the Inventors would become directors of MMT and that Bach would receive a salary and stock options.

*Fact # 3: MMT incorporated on November 8, 1989.*

Plaintiffs had constructive and actual notice that MMT was a new corporation from the Option Contract which reveals that MMT had "$1,000,000 of initial equity capital," Def. Ex. 3 at ¶ 1, and from the Harris Press Release which states "Harris & Harris Group, Inc. announced today that its wholly-owned subsidiary, ... has formed a new wholly-owned subsidiary, Molten Metal Technology, Inc." Def. Ex. 23. Plaintiffs also had constructive notice of MMT's date of incorporation from the articles of incorporation which are public documents on file with the Secretary of State in Delaware, MMT's place of incorporation. *Eckstein,* 58 F.3d at 1168 (investors had constructive notice of allegedly omitted facts from the registration statement, a public document filed with the Securities and Exchange Commission). The totality of publicly available information negates a finding that the Inven-

tors intentionally omitted the fact that MMT was newly incorporated or the date of incorporation.

*Fact # 4: The Inventors were negotiating with third parties regarding the sale of the Patents.*

The fact that the Inventors were looking to sell their technology to third parties was revealed in the Option Contract which provides

MMT, ... desires to obtain an option to purchase the Technology and to commercialize the Technology as contemplated by this contract.... MMT or its assignee shall be entitled to exercise the Option if, and only if ... a corporation ... or other entity (in any case, a "Successor Company") capitalized with $20,000,000 or more in cash, property, property rights, or any combination thereof shall have entered into a binding agreement or other arrangement with ... MMT ....

Def. Ex. 3 at ¶¶ 1, 4. These paragraphs show that the Inventors were already negotiating with MMT, a third party, regarding the sale of the Patents, and that they would look for another third party, "a successor company", to whom they could sell their technology.

*Fact # 5: The Inventors were "founders" of MMT.*

Finally, whether the Inventors were "founders" is an issue of fact without legal significance. Viewed one way, it would be easy to conclude that they were not "founders." The Plaintiffs fail to define this term, but Black's Law Dictionary defines "founder" as "[t]he person who endows an eleemosynary corporation ... or supplies the funds for its establishment." Here, the record shows that Harris, not the Inventors, provided all of the initial capital for MMT. Thus, by the Black's Law Dictionary definition Harris was the "founder" of the corporation, not the Inventors. Plaintiffs do not explain why it mattered that the Inventors were "founders" of MMT or what this would have meant to them. What did Plaintiffs want to know? That MMT was "a new wholly-owned subsidiary [formed] ... to commercialize the Nagel–Bach Process for destruction of waste"? Harris Press Release, Def. Ex. 23. That

MMT would name "Christopher J. Nagel, co-inventor ... as its President; and Dr. Bach as its Vice–Chairman"? Harris Press Release, Def. Ex. 23. That "Nagel [would] enter into an employment agreement for a three-year term" with MMT or its assignee? Option Contract, Def. Ex. 3. It is not clear what specific factual disclosures would have satisfied Plaintiffs' desire to know that the Inventors were "founders." But in any case information showing that the Inventors were integrally involved with MMT was public and available to Plaintiffs before they agreed to settle, so this is not a suitable basis for a fraud claim.

*Fact # 6: The Inventors failed to inform Plaintiffs that they would unilaterally reduce the sale price of the Patents.*

Plaintiffs' allegation that the Inventors fraudulently failed to inform them at the time of settlement that they would reduce the sales price of the Patents (in the future) is self-evidently frivolous. The parties signed the Settlement Agreement around April 12, 1990, and then six months later around October 12, 1990 the Inventors agreed to reduce the sales price of the Patents. Plaintiffs have not offered any evidence to show that the Inventors knew in April 1990 or earlier that they would reduce the sales price in the future. Therefore I conclude that this information was not omitted, it simply did not exist.

In sum, the record shows that the Inventors actually disclosed most of the allegedly omitted facts to Plaintiffs by giving them a copy of the Option Contract or constructively disclosed them by making information public through the press release and mandatory government filings (i.e. the Articles of Incorporation). The Inventors' behavior belies an inference or conclusion that they intentionally omitted material facts. Still, where some of my findings rest on constructive notice and where the Inventors may have omitted the fact that the Inventors would serve as MMT directors and that Bach would receive a salary and stock options from MMT, I consider what proof exists as to the other elements of fraud.

Plaintiffs present a variety of circumstantial evidence to show that the Inventors pos-

sessed fraudulent intent. For example, plaintiffs allege that the Inventors and their associates failed to return Sain's phone calls and requests for information; Nagel failed to tell Sain during a June 1990 telephone conversation that the TAA was being renegotiated; the Inventors only informed Plaintiffs about the amended TAA (which was completed on October 12, 1990) in April of 1991; John Kehoe, the Inventors' attorney, stated that the Patents were not useful, that they were re-evaluated by MMT, and failed to explain that defendants amended the TAA to enable the Traveler's investment. I conclude that these facts are no more indicative of fraud than of an innocent occupation with other business or unreliability; and without more the Inventors' actions after the settlement are of little value in showing that they intended to induce Plaintiffs to settle by failing to disclose material facts prior to settling. I also find that the record as a whole negates an inference that the Inventors possessed fraudulent intent. In addition to the fact that the Inventors allowed Harris & Harris to issue the November 1989 press release which revealed the significant aspects of the MMT transaction and the fact that the Inventors gave Plaintiffs a copy of the Option Contract four months before they signed the Settlement Agreement, Sain's own admission in a deposition that the Inventors complied with all requests for information indicates good intent.

 In addition to Plaintiffs' weak showing on the issues of material omissions and fraudulent intent, Plaintiffs have failed to show justifiable reliance upon any alleged omissions. "To be actionable ... fraud must induce reliance—must in other words be both believed (if it is not believed, it can hardly be described as fraud) and acted on." *AMPAT*, 896 F.2d at 1041 (citation omitted). The victim of fraud need not dig beneath apparently adequate assurances, but he has two duties of care: (1) he cannot close his eyes to a known risk and (2) he cannot close his eyes to a risk that is obvious. *Id.* at 1041–42 (citations omitted). To decide whether a person justifiably relied on material omissions or misrepresentations, courts look to all of the circumstances surrounding

the transaction, including the parties' relative knowledge of available facts, the opportunity to investigate the facts, and prior business experience. *Runnemede Owners, Inc. v. Crest Mortgage Corp.*, 861 F.2d 1053, 1058 (7th Cir.1988). Here, I find that the circumstances surrounding the Settlement Agreement weigh against finding justifiable reliance. Although it is clear that the Inventors possessed greater knowledge than Plaintiffs of the relevant facts about MMT, the Option Contract (which Plaintiffs possessed) contained sufficient information to convey a general idea of the MMT transaction and a basis for formulating questions regarding undisclosed information. Also, Plaintiffs had an excellent opportunity to investigate the facts: approximately five months passed between the November 1989 telephone conference call when Plaintiffs learned about MMT and the April 1990 signing of the Settlement Agreement. But Plaintiffs apparently failed to ask questions about the simple facts they point to now, e.g., MMT's date of incorporation. As for prior business experience, Plaintiffs had a lot of experience with similar deals—i.e., commercializing technology—and the Inventors did not.

Plaintiffs argue that the Inventors engaged in the November 1989 telephone conference call for the purpose of lulling Plaintiffs into a false sense of security and thereby inducing justifiable reliance, but I find no factual support for this claim. Additionally, I conclude that the mere fact that the telephone conference call occurred does not show lulling—once the Inventors decided to develop their technology without Plaintiffs' help they had to notify Plaintiffs of their decision. The relation between placing the phone call and "lulling" is too speculative to show fraud. Moreover, the record shows that Plaintiffs were not lulled by the Inventors. A letter written by Sain to Anthony Carroll, the Inventors' attorney, dated November 21, 1989 demonstrates Plaintiffs' awareness that Bach and Nagel were discussing the sale of their Patents with MMT and that Plaintiffs were suspicious:

> We also view the activities of MIT and Harris/Harris *with suspicion.* It is clear to us that by MIT and Harris/Harris restricting their discussions only with Nagel and Bach they have made a pre-determination that Exotherm has no rights to be involved in such verbal exchanged or the products produced therefrom. (Emphasis added).

Def. Ex. 24. Given Plaintiffs' general expertise in business and law, their experience dealing with start-up technology companies in particular, their knowledge of the discussions between the Inventors and MMT, and the suspicions they voiced before agreeing to settle, I find that Plaintiffs did not justifiably rely on any omissions. Not only did Plaintiffs know a multitude of facts about MMT before signing the Settlement Agreement, they knew enough to ask the right questions and elicit the information that they believed to be material before releasing their rights in Exotherm. Plaintiffs were reckless in failing to discover the information they now claim was fraudulently omitted which they could have accomplished by asking simple questions (i.e., "When did MMT incorporate?" and "What roles will Bach and Nagel assume at MMT?"). Plaintiffs' bald assertions that they relied on the Inventors and "we would have acted differently if we had known" is insufficient at the summary judgment stage to show that there is an issue of fact as to materiality or reliance, especially in the face of substantial evidence to the contrary. *See In re Soybean Futures Litigation,* 892 F.Supp. 1025, 1060 (N.D.Ill.1995) ("Plaintiffs' bald assertions that they would not have acted as they did had they known otherwise is immaterial."). Finally, I conclude that Plaintiffs have not shown they suffered an injury as a result of the Inventors' alleged omissions.

Plaintiffs have failed to establish the elements of common-law fraud and no reasonable jury could find that the Inventors committed fraud by clear and convincing evidence. Therefore, summary judgment is granted in favor of the Inventors.

## C. Count III: Breach of Fiduciary Duties By The Inventors

The Inventors seek summary judgment on Plaintiffs' breach of fiduciary duty claim.

The Inventors contend that they did not make any omissions or misrepresentations that could serve as the basis for a breach of fiduciary duty claim. They also allege, without citing legal precedent, that the fiduciary duties they owed Plaintiffs terminated after November 13, 1989 (the date of the telephone conference call in which the Inventors notified Plaintiffs of their intentions to work with another company), thus the Settlement Agreement was the product of an arms-length bargain. In response, Plaintiffs allege that the Inventors usurped a corporate opportunity by creating MMT to develop the Patents instead of bringing Harris, Preston and Haney (and, presumably, their money) into Exotherm Corporation. Plaintiffs also insist that their rights to develop the Patents were exclusive and that it is irrelevant who owned the actual Patents because their claims arose from the breach of the Settlement Agreement, not from patent ownership. In reply, the Inventors contend that Exotherm possessed a non-exclusive right to develop the Patents or an exclusive right that was terminable at will. Thus, the Inventors retained the right to develop their Patents with another party, and they did not usurp an Exotherm corporate opportunity by working with MMT.

■■■ To establish that the Inventors breached fiduciary duties, plaintiffs must show: (1) the existence of a duty owed by the defendant to the plaintiff, (2) a breach of that duty, and (3) an injury proximately resulting from the breach. *United States v. First Midwest Bank/Illinois, N.A.*, 1997 WL 675192, at *15 (N.D.Ill. Oct.28, 1997) (citation omitted). The parties essentially agree that the Inventors owed fiduciary duties to the Plaintiffs due to their status as majority shareholders in a close corporation (although they disagree about when those duties terminated). What I must decide is whether the Inventors breached their duties and whether any injury proximately resulted from the breach. A shareholder in a close corporation owes a duty of loyalty to the corporation and to the other shareholders. *Rexford Rand Corp. v. Ancel*, 58 F.3d 1215, 1218 (7th Cir. 1995) (citations omitted). Accordingly, shareholders have the obligation to "deal with the utmost good faith, fairly, honestly,

and openly with their fellow stockholders." *Id.* at 1219 (citation omitted). Fiduciaries should not actively exploit their positions within the corporation for their own personal benefit or hinder the ability of a corporation to continue the business for which it was developed. *Dowd & Dowd, Ltd.*, 220 Ill.Dec. 37, 672 N.E.2d at 862 (citations omitted). Under the corporate opportunity doctrine, "one who occupies a fiduciary relationship to a corporation may not acquire, in opposition to the corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence." *Regal–Beloit Corp. v. Drecoll*, 955 F.Supp. 849, 859 (N.D.Ill.1996) (quotation and internal citation omitted).

■■■ The parties largely fail to cite legal authority and facts to support the conclusions they advance, and I find little evidence in the record to show that the Inventors breached their fiduciary duties. Plaintiffs have failed to produce evidence that the Inventors granted them exclusive rights to develop the Patents or to show any consideration supporting such an agreement. However, I need not resolve this issue conclusively because Plaintiffs have failed to prove another essential element of their claim: damages. Essentially, Plaintiffs' entire argument on the damages issue is that they "are not limited to 'some vague rights in the Patents, but rather Plaintiffs are entitled to their fair share of all compensation received by Nagel and Bach, including a portion of the options.'" Resp. at 53. While I agree in a general sense that Plaintiffs are entitled to their "fair share", of what, precisely, remains to be determined. More importantly, there is no reason to believe that Plaintiffs will not receive their "fair share" according to the terms of the Settlement Agreement, and in fact this issue is properly addressed within the context of Plaintiffs' contract claim. I also observe that Plaintiffs executed the Settlement Agreement and thereby became entitled to receive essentially one-third of whatever value the Inventors receive from a sale of their Patents. This demonstrates that Plaintiffs have benefitted from working with the Inventors, and there is no evidence that their benefit should have been even greater

absent the alleged omissions. In sum, Plaintiffs fail to show that the Inventors' alleged breach of duties caused any injury or even describe the nature of their injuries. Without an injury, there is no claim. Therefore, summary judgment on Plaintiffs' breach of fiduciary duties claim is granted in favor of defendants.

## IV. MMT's Motion

MMT moves separately for summary judgment on the three claims that Plaintiffs brought against it.

### A. Count IV: Civil Conspiracy

 Defendant MMT moves for summary judgment on Plaintiffs' civil conspiracy claim and argues that Plaintiffs failed to present facts demonstrating that there was any conspiratorial agreement or tort in further of a conspiracy. Civil conspiracy is a combination of two or more persons for the purpose of accomplishing either an unlawful purpose or a lawful purpose by unlawful means. *Adcock v. Brakegate, Ltd.*, 164 Ill.2d 54, 62, 206 Ill.Dec. 636, 645 N.E.2d 888 (Ill. 1994) (citation omitted). The elements of civil conspiracy are: (1) an agreement; (2) to participate in an unlawful act or a lawful act by unlawful means; (3) an overt act performed in furtherance of the scheme; and (4) an injury caused by the overt act. *Dowd & Dowd, Ltd. v. Gleason*, 284 Ill.App.3d 915, 928, 220 Ill.Dec. 37, 672 N.E.2d 854 (1st Dist.1996). "The function of a conspiracy claim is to extend liability in tort beyond the active wrongdoer to those who have merely planned, assisted or encouraged the wrongdoer's act." *Adcock*, 164 Ill.2d at 63, 206 Ill.Dec. 636, 645 N.E.2d 888 (citing W. Prosser, Torts § 46, at 293 (4th ed.1971)). The gist of the claim is that one of the parties to the agreement must commit a tortious act in furtherance of the agreement. *Id.* (citations omitted). "An agreement to commit a wrongful act is not a tort, even if it might be a crime[; a] cause of action for civil conspiracy exists only if one of the parties to the agreement commits some act in furtherance of the agreement, which is itself a tort." *Id.* (citations omitted).

 Plaintiffs allege that defendants agreed to decrease the Inventors' compensation for selling the Patents from $4,000,000 to $1,500,000 and thereby reduce the amount of compensation due Plaintiffs under the Settlement Agreement. I acknowledge that Plaintiffs submit a variety of evidence to show that defendants entered into an agreement to commit an unlawful act. But even if Plaintiffs could prove all the other elements of a civil conspiracy claim here, I conclude that their claim ultimately fails because they have not alleged facts sufficient to establish the gist of a conspiracy claim—that any of the defendants committed a tortious act in furtherance of an agreement. Plaintiffs argue that Nagel and Bach's fraudulent activities and breach of fiduciary duties constitute tortious acts in furtherance of their conspiracy with MMT, that may also be imputed to MMT. However, I have already concluded that there is insufficient evidence to show that Nagel and Bach committed either of these torts. Plaintiffs also contend that other MMT directors took part in the conspiracy. For example, Preston failed to disclose relevant facts during the November 13, 1989 conference call, and Haney and Preston voted to give Nagel and Bach stock options. But barring a finding that such torts were committed, these acts are harmless. Besides, Plaintiffs have neither explained why Preston had a duty to disclose any information to them nor what it is that he failed to disclose, and the act of granting stock options is generally lawful.

Plaintiffs have failed to present facts demonstrating that any of the defendants committed a tortious act in furtherance of a conspiratorial agreement, and so I grant summary judgment in favor of defendants.

### B. Count V: Inducement of Breach of Fiduciary Duties

MMT seeks summary judgment on Plaintiffs' claim for inducement of a breach of fiduciary duties because of Plaintiffs' failure to show inducement, the existence of any fiduciary duty, and a breach of fiduciary duties. Alternatively, MMT argues that this claim can only be maintained in the context of public officials and employment contracts.

Plaintiffs argue that genuine issues of material fact regarding MMT's wrongful inducement and whether the Inventors, Nagel and Bach, breached fiduciary duties preclude summary judgment.

 "Under Illinois law, a third party who knowingly participates in or induces a breach of duty by an agent is liable to the person to whom the duty was owed. The third party must also obtain a benefit from the breach." *In re Kids Creek Partners, L.P.*, 212 B.R. 898, 938 (Bankr.N.D.Ill.1997) (quoting *In re Salem Mills, Inc.*, 881 F.Supp. 1109, 1116 (N.D.Ill.1995)). A vital element of this claim is that the third party conspired with the fiduciaries. *Kids Creek*, 212 B.R. at 938 (citing *Pappas v. Buck Consultants, Inc.*, 923 F.2d 531, 542 (7th Cir.1991)). This claim derives from Plaintiffs' civil conspiracy and breach of fiduciary duties claims. I have already found a lack of evidence of a conspiracy between MMT and the Inventors or of a breach of fiduciary duties on the part of the Inventors. Therefore, summary judgment is granted as to this claim, too.

### C. Count VI: Tortious Interference

 Finally, MMT seeks summary judgment on Plaintiffs' tortious interference claim. Plaintiffs allege that MMT interfered with their rights under the Settlement Agreement by paying the Inventors a small sum of cash and stock options for their Patents instead of a large sum of cash and by inducing the Inventors to withhold payments due to Plaintiffs. "The purpose of imposing tort liability upon persons who interfere with the contractual relations of others is to protect interests in contractual relations against forms of interference which, on balance, the law finds repugnant." *In re Estate of Albergo*, 275 Ill.App.3d 439, 447, 211 Ill.Dec. 905, 656 N.E.2d 97 (2d Dist.1995). "To establish a prima facie action for tortious interference with a contractual relationship, a plaintiff must prove: 1) the existence of a valid and enforceable contract between the plaintiff and another party; 2) that the defendant was aware of the contractual relationship; 3) an intentional and unjustified inducement of a breach of the contract by the defendant; 4) the subsequent breach of the contract by the

other party, caused by the defendant's inducement; and 5) damages." *Williams v. Shell Oil Co.*, 18 F.3d 396, 402 (7th Cir.1994). I have already found that the Settlement Agreement between Plaintiffs and the Inventors is valid, and it is undisputed that MMT was aware of the Settlement Agreement. The disagreement here is over elements three and four of the tortious interference claim.

 Did MMT induce the Inventors to breach the Settlement Agreement? To establish inducement, Plaintiffs must show active persuasion, encouragement or incitement that goes beyond merely providing information in a passive way. *In re Estate of Albergo*, 275 Ill.App.3d at 446, 211 Ill.Dec. 905, 656 N.E.2d 97. Unfortunately, Plaintiffs do not specifically articulate the facts that show MMT's inducement, but their argument goes generally like this. After agreeing to pay the Inventors $3,000,000 for their Patents pursuant to the Option Contract (which agreement Plaintiffs possessed and presumably referred to in devising the terms of the Settlement Agreement), MMT induced the Inventors to enter into several subsequent agreements. Finally, in the amended TAA, MMT reduced the Inventors' compensation for the Patents to $1,500,000 and agreed separately and without disclosing it to anyone else that they would grant stock options to the Inventors to make up for the reduced monetary compensation. MMT and the Inventors then falsely designated the stock options as payment for employment and consulting services, and thereby attempted to represent the Allocated Value of the Patents as $1,500,000 instead of $3,000,000 in order to reduce the amount that Plaintiffs could collect pursuant to the terms of the Settlement Agreement. In support of this claim, Plaintiffs allege that MMT granted stock options to Nagel and Bach on October 22, 1989, 12 days after the execution of the amended TAA. Plaintiffs contend that these options represent partial payment for the Patents. Plaintiffs also allege that the Inventors accepted the $2,500,000 reduction in compensation for their Patents without obtaining any legal advice or outside appraisals of the Patents' value and suggest this can only be

explained by the fact that MMT made up for the reduction in monetary compensation by granting them valuable stock options. MMT contends that it did not induce a breach of the Settlement Agreement. I find that the fact that MMT granted the Inventors stock options several days after executing the amended TAA and the fact that the Inventors accepted $2,500,000 less for their Patents than they originally agreed to without, apparently, any objection or outside advice permits a reasonable inference that stock options constituted disguised consideration for the Allocated Value of the Patents. This in turn raises a material issue of fact as to whether MMT amended the TAA and thereby altered the Inventors' compensation in order to induce the Inventors to pay Plaintiffs less than the Allocated Value of the Patents.

The other two elements of the tortious interference claim—a breach of contract and damages—cannot be determined at this time. As discussed above, material issues of fact preclude deciding whether the Inventors breached the Settlement Agreement. The parties do not dispute the damages element, and it is quite clear that if Plaintiffs succeed in proving the other elements of their claim, they will succeed in showing damages. Thus, the Inventors' motion for summary judgment is denied on Plaintiffs' claim for tortious interference with contractual relations.

Finally, Plaintiffs suggest that MMT induced the Inventors to withhold payments they owed to Plaintiffs. However, Plaintiffs do not cite any portions of the record in support of this allegation,[5] and so I reject it and hold that Plaintiffs may not base a claim for tortious interference upon any such facts.

### V. Conclusion

Summary judgment is granted in part and denied in part. As for the Amended Complaint, summary judgment is granted in favor of defendants on Count II (fraud), Count III (breach of fiduciary duties), Count IV (civil conspiracy), and Count V (inducement of breach of fiduciary duties). Summary Judgment is denied on Count I (breach of contract) and Count VI (tortious interference with contractual relations). Regarding defendants' counterclaims, summary judgment is granted in favor of Plaintiffs on Count I (the FIDSA claim) and denied on Count II (breach of fiduciary duties).[6]

---

5. Plaintiffs cite several parts of the record to support this allegation, but I researched the record and found that the referenced portions did not support their allegations in any way. This incident was not the only one of its kind, I found numerous instances where Plaintiffs cited portions of the record in support of allegations in their briefs when in fact the portions cited were either not contained in the record or not supportive of the propositions alleged.

6. This decision also narrows some of the issues for trial. Namely, in the context of Plaintiffs' breach of contract claim the Inventors may not argue that negotiation of the Allocated Value is an unfulfilled condition precedent. In addition, Plaintiffs may not base their claim for tortious interference with contractual relations on MMT inducing the Inventors to withhold payments to Plaintiffs.