**THE DIVERSIFIED GROUP, INC., Plaintiff,**

v.

**Paul DAUGERDAS, Defendant.**

**Jenkens & Gilchrist, Plaintiff,**

v.

**The Diversified Group, Inc., Defendant.**

Nos. 00 Civ. 0771(SAS), 00 Civ. 6484(SAS).

United States District Court, S.D. New York.

March 22, 2001.

William B. Wachtel, John W. McConnell, Wachtel & Masyr LLP, New York City, for the Diversified Group, Inc.

Bruce R. Meckler, Mari Henry Leigh, Eric D. Stubenvoll, Meckler, Bulger & Tilson, Chicago, IL, Gregory L. Diskant, Andrew D. Schau, Patterson, Belknap, Webb & Tyler LLP, New York City, for Paul Daugerdas.

John G. Hutchinson, David P. Draigh, Sidley & Austin, New York City, William F. Conlon, Anne K. Rea, John K. Van De Weert, Sidley & Austin, Chicago, IL, for Jenkens & Gilchrist.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

These actions, which have been consolidated for all purposes, arise from a dispute between The Diversified Group, Inc. ("DGI") and Paul Daugerdas, in connection with the Optional Partnership Strategy ("OPS"), a tax strategy designed to enable individuals or corporations to achieve tax savings through the use of European-style digital options. In the first action, No. 00 Civ. 0771, DGI is suing Daugerdas for breach of fiduciary duty, breach of contract and unjust enrichment.[1] Specifically, DGI alleges that Daugerdas, as DGI's attorney, breached his fiduciary duty to DGI by disclosing and marketing the OPS to his clients without fairly compensating DGI or obtaining its consent. *See* DGI's Complaint ("DGI Compl.") ¶¶ 26–29. In

---

1. DGI's Complaint also contains counts seeking injunctive relief and a constructive trust. Both of these remedies arise from DGI's substantive claims.

addition, DGI alleges that by failing to refer potential clients who might have benefitted from the OPS to DGI, Daugerdas breached the terms of a valid contractual understanding between the parties. *See id.* ¶¶ 32, 33.

In the second action, No. 00 Civ. 6484, the law firm of Jenkens & Gilchrist ("J & G"), Daugerdas' current employer, asks this Court to vindicate its rights in the first action by declaring that: (1) J & G, via Daugerdas or otherwise, had no contractual obligation to refer clients to DGI; (2) J & G was never obligated to refer clients to DGI; and (3) the OPS allegedly disclosed to Daugerdas was not confidential.[2] Jurisdiction over both actions is based on diversity of citizenship pursuant to 28 U.S.C. § 1332.

Daugerdas and J & G (collectively the "moving parties") have filed separate motions for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). For the reasons set forth below, their motions are denied in part and granted in part.

## I. BACKGROUND [3]

### A. The Parties

DGI is engaged in the business of conceiving and marketing products and methods designed to help taxpayers minimize their corporate and/or personal income taxes. *See* 9/7/00 Deposition of James Haber ("Haber Dep."), President of DGI, Ex. 2 to Paul Daugerdas' Motion for Summary Judgment ("Daugerdas Mot."), at 7–8. DGI is not a licensed accounting firm nor does it engage in the practice of law. *See id.* DGI's business includes "developing tax strategies and using them in transactions meeting clients' particular business and investment objectives." Affirmation of Orrin Tilevitz in Opposition to the Motions for Summary Judgment ("Tilevitz Aff."), Vice President and General Counsel of DGI, Ex. 6 to the Affidavit of John McConnell in Opposition to the Motions for Summary Judgment ("McConnell Aff."), Counsel for DGI, ¶ 6.

Daugerdas is a Certified Public Accountant and is licensed to practice law in Illinois. *See* Affidavit of Paul Daugerdas in Support of his Motion for Summary Judgment ("Daugerdas Aff."), Ex. 9 to Daugerdas Mot., ¶ 2. A majority of Daugerdas' work involves rendering legal opinions on tax strategies upon the advice and suggestion of entities such as DGI. *See id.* ¶ 7. Prior to 1994, Daugerdas was employed by Arthur Anderson & Co., holding a variety of positions, including Partner in Charge of the Futures and Options Tax Practice. *See id.* ¶ 5. From 1994 to December 28, 1998, Daugerdas was a partner at the law firm of Altheimer & Gray ("A & G"), where the last position he held was Chairman of the Tax Department. *See id.* ¶ 4.

Since December 29, 1998, Daugerdas has been employed by J & G, a law firm with its principal place of business in Illi-

---

**2.** The second action was originally filed in the Circuit Court of Cook County, Illinois. *See* J & G's Complaint ("J & G Compl.") at 1. It was removed from the Circuit Court to the United States District Court for the Northern District of Illinois by DGI pursuant to 28 U.S.C. §§ 1332(a)(1) and 1441(a). *See* 5/3/00 Notice of Removal at 1. The case was then transferred to this Court pursuant to 28 U.S.C. § 1404(a), *see* 8/23/00 Transfer Order, and the actions were formally consolidated on September 18, 2000. *See* 9/18/00 Stipulation and Order to Consolidate.

**3.** All facts discussed are viewed in a light most favorable to DGI, the non-moving party. *See Schonfeld v. Hilliard,* 218 F.3d 164, 172 (2d Cir.2000). However, only those facts that have been properly set forth in accordance with Rule 56(e) and Local Rule 56.1 will be considered for purposes of these motions. *See Morris v. Northrop Grumman Corp.,* 37 F.Supp.2d 556, 569 (E.D.N.Y.1999).

nois. *See id.* ¶ 3; J & G Compl. ¶ 1. Daugerdas is currently serving as the Managing Shareholder of J & G's Chicago office and head of J & G's Structured Investment practice. *See* Daugerdas Aff. ¶ 3.

## B. The Relationship between DGI and Daugerdas

Haber and Daugerdas have known each other for approximately ten years. *See* Haber Dep. at 25–26; 10/11/00 Deposition of Paul Daugerdas ("Daugerdas Dep."), Ex. 10 to Daugerdas Mot., at 108. Despite this, the precise nature of their relationship is in dispute.

In July 1992, Haber sent Daugerdas materials describing various financial products marketed by DGI. *See* 7/9/92 Letter, Ex. 9 to McConnell Aff. In the accompanying letter, Haber expressed his belief that Daugerdas would keep these materials confidential. *See id.* Haber sent Daugerdas additional materials and a similar letter two and one-half months later. *See* 9/23/92 Letter, Ex. 10 to McConnell Aff.

In March 1995, Daugerdas, an attorney with A & G at the time, agreed to evaluate the merits of a tax strategy designed by DGI to assist companies in utilizing excess foreign tax credits. Daugerdas signed a confidentiality agreement stating that any information provided to him by DGI for this purpose would be kept confidential. *See* 3/1/95 Letter, Ex. 12 to McConnell Aff. However, the confidentiality agreement expressly permitted Daugerdas to present this strategy to prospective clients if they agreed to sign a confidentiality agreement. *See id.* In the event a prospective client decided to utilize the strategy, DGI was to be fairly compensated. *See id.*

## 1. The Engagement Agreement

In November 1996, Daugerdas and A & G were engaged by Haber to represent DGI as its attorneys in connection with "certain commercial, corporate and federal income tax issues" associated with DGI's Alternative Long–Term Financing Strategy ("ALFS"). *See* 11/15/96 Engagement Agreement, Ex. 13 to McConnell Aff.[4] Pursuant to this agreement, Daugerdas was required to "maintain the confidentiality of information" provided by DGI, except to the extent DGI consented to the contrary, or as "necessary to carry out [its] representation or as required by the ethical rules governing lawyers or by applicable law." *Id.* DGI was free to terminate the relationship at any time, whereupon DGI's "papers and property [would] be returned . . . promptly after [A & G's] receipt of payment of all fees and expenses." *Id.*

While Daugerdas was required to keep confidential the information DGI provided him, he was permitted to introduce the ALFS to other entities. In fact, because Daugerdas' fees were calculated in accordance with the extent of his involvement in a particular ALFS transaction, there was an incentive for Daugerdas to do so. For example, if Daugerdas merely rendered a tax opinion for an ALFS transaction introduced to him by DGI, he was entitled to a commission of .5% of the size of that transaction. *See id.* On the other hand, if Daugerdas introduced a prospective client to the ALFS transaction, he was entitled to 50% of DGI's net profit on the transaction. *See id.*

At the time the engagement agreement was executed, DGI forwarded Daugerdas marketing materials and a redacted tax opinion discussing the legality of the ALFS. *See* 11/15/96 Marketing Letter, Ex.

---

4. Daugerdas was designated as the principal attorney handling DGI's matters. *See* Engagement Agreement at 1.

14 to McConnell Aff. In January 1997, Daugerdas sent a comment letter to Haber addressing a number of legal issues concerning the ALFS. *See* Comment Letter, Ex. 16 to McConnell Aff.

DGI alleges that following the execution of the engagement agreement and until October 1999, it acted and communicated with Daugerdas under the belief that Daugerdas was its attorney. *See* Haber Aff. ¶¶ 5, 6. According to Haber, the engagement agreement set forth the parties' understanding as to how they would operate with respect to future tax strategies conceived by DGI. *See* Haber Dep. at 30–31.

### 2. The Oral Contract

DGI also alleges that its relationship with Daugerdas "represented a valid contractual understanding between the parties." DGI Compl. ¶ 31. Pursuant to this contractual understanding, once Daugerdas agreed to help DGI evaluate and develop one of its tax strategies, he was prohibited from marketing that strategy to prospective clients or participating in transactions involving that strategy without fairly compensating or obtaining DGI's consent. *See* Haber Dep. at 33–37, 47, 122; Haber Aff. ¶ 22. Any profits Daugerdas earned from participating in such transactions were to be shared equally with DGI. *See* Haber Dep. at 111–113; Haber Aff. ¶ 21. In return, DGI promised to make all of its clients aware that Daugerdas' firm was willing to render an opinion letter on the correct tax treatment of their transaction. *See* Haber Dep. at 37. According to Haber, the parties' obligations under this oral contract were reiterated each time a new strategy was developed by the parties. *See id.* at 32.

### C. The Tax Strategies: The OPS and Short–Sale Strategy

#### 1. The OPS

A tax strategy is defined as a technique used in a business or investment transaction designed to achieve a particular tax result predicated on particular economic and tax principles. *See* Tilevitz Aff. ¶ 5; Affidavit of R.J. Ruble in Opposition to the Motions for Summary Judgment ("Ruble Aff."), Attorney for Brown & Wood LLP, Ex. 7 to McConnell Aff., ¶ 3; Affidavit of Ira Akselrad, Attorney for Proskauer Rose LLP, Ex. 8 to McConnell Aff., ¶ 3. In a letter submitted to opposing counsel, as well as to the Court, DGI defined the OPS as follows:

> The option partnership strategy is a tax-saving strategy wherein a taxpayer purchases and writes options and transfers these option positions to a partnership so as to create substantial increased basis in the partnership interest. As a result of these trades and transfer, the taxpayer claims that the basis of the taxpayer's partnership interest is increased by the cost of purchased call options, but is not reduced as a result of the partnership's assumption of the taxpayer's obligation with respect to the written call options.

8/24/00 Letter, Ex. 1 to Daugerdas Mot. During Haber's deposition, this definition was modified to incorporate the use of European-style digital options. *See* Haber's Dep. at 22. According to DGI, while European-style digital options "in and of themselves are not unique," *see id.* at 73, the use of European-style digital options is essential to the OPS because it "permit[s] significant leverage to be obtained by the option purchaser, as required by the [OPS], at relatively modest cost and minimum risk." Haber Aff. ¶ 37.

DGI asserts that the OPS originated sometime in 1998 during a conversation between Orrin Tilevitz,[5] an attorney, who

---

5. Tilevitz is currently employed as Vice President and General Counsel of DGI. *See* Tilevitz Aff. ¶ 1.

at the time was an employee of Price Waterhouse LLP engaged by DGI to review and develop tax strategies, and R.J. Ruble, a lawyer with the firm of Brown & Wood LLP. *See* Tilevitz Aff. ¶ 9; Ruble Aff. ¶ 11. According to Haber, DGI spent "hundreds of hours of professional time" developing the OPS into a functional tax strategy. Haber Aff. ¶ 32.

## 2. The Short–Sale Strategy

From 1991 until October 1999, Daugerdas was marketing a tax strategy known as the short-sale strategy. *See* Haber Dep. at 29, 63–64, 73, 213–215. Generally speaking, when utilizing this strategy, a prospective client borrows a treasury security, sells the security short, and then contributes the proceeds to a partnership in exchange for a partnership interest. *See id.* at 75–76. According to Haber, the short-sale strategy had the same "technical [tax] result" as the OPS. *See* Haber Dep. at 63, 76. Prior to 1994, Daugerdas discussed the idea of substituting options in place of the short-sale of securities with Emil Pesiri, a personal acquaintance and business associate. *See* Declaration of Emil Pesiri, Managing Director of Intercontinental Capital Associates, Ex. 12 to Daugerdas Mot.; Daugerdas Dep. at 190–91. Sometime in 1995 or 1996, Daugerdas began informing his clients that they could substitute options for the short-sale of securities and achieve the same tax result. *See* Daugerdas Aff. ¶ 10; Daugerdas Dep. at 252–54. In December 1996, Daugerdas forwarded Haber a memorandum outlining a legal argument supporting the short-sale strategy. *See* 12/6/96 Memorandum, Ex. 15 to McConnell Aff. This memorandum was stamped "Strictly Confidential" and "Subject to Attorney–Client Privilege and Nondisclosure Agreement." *See id.*

## D. Daugerdas' Alleged Breach

Haber communicated the idea of the OPS to Daugerdas sometime in 1998. *See*

Haber Aff. ¶ 13. According to Haber, Daugerdas agreed to help evaluate the strategy's tax consequences, as well as develop and market the strategy in accordance with their prior practice and the terms of their contractual understanding. *See* Haber Dep. at 41–54. In October 1999, the House Ways and Means Committee of the United States Congress issued proposed legislation adversely impacting the use of treasuries in the short-sale strategy. *See* Daugerdas Dep. at 249. Thereafter, Daugerdas began to employ the OPS for his clients. *See id.* at 270, 283. To date, Daugerdas has implemented the OPS for the "benefit of dozens of clients" without compensating DGI or obtaining its consent. *See id.*

## II. LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "An issue of fact is 'material' for these purposes of it might affect the outcome of the suit under the governing law[,] [while] [a]n issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir.2000) (internal quotations and citations omitted).

In assessing the record to determine whether genuine issues of material fact are in dispute, a court must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Parkinson v. Cozzolino*, 238 F.3d 145, 149–50 (2d Cir.2001). "Although the moving party bears the initial burden of estab-

lishing that there are no genuine issues of material fact, once such a showing is made, the non-movant must 'set forth specific facts showing that there is a genuine issue for trial.'" *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir.2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). However, the non-moving party may not "rest upon ... mere allegations or denials." *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir.2000). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir.1999); *see also Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir.1998) ("If the evidence presented by the non-moving party is merely colorable, or is not significantly probative, summary judgment may be granted.") (internal quotations, citations, and alterations omitted).

## III. DISCUSSION

### A. Breach of Fiduciary Duty

Count I of DGI's Complaint alleges that Daugerdas, as DGI's attorney, breached his fiduciary duty by (1) failing to preserve the OPS in confidence; (2) employing the OPS in business transactions with other clients, and thereby profiting from DGI's exclusion; (3) failing to inform DGI of his intention to use the OPS with other clients; and (4) failing to comply with DGI's demand that he discontinue use of the OPS with third parties. *See* DGI Compl. ¶¶ 26–30. Because jurisdiction is based on diversity, the first question is what state law to apply. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) (a federal court sitting in diversity applies state substantive law).

### 1. Choice of Law [6]

Although the parties do not specifically discuss choice of law, they disagree as to whether Illinois or New York law should apply to this claim.[7] In determining which state's law to apply a court must look to the choice of law rules of the state in which it sits. *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–497, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see also Gupta v. Rubin*, No. 00 Civ. 3091, 2001 WL 59237, at *3 (S.D.N.Y. Jan. 24, 2001); *Global Entm't, Inc. v. New York Tel. Co.*, No. 00 Civ. 2959, 2000 WL 1672327, at *2 (S.D.N.Y. Nov. 6, 2000). According to New York's choice of law rules, a court should give controlling effect to the law of the jurisdiction with the most significant interest in the specific issues involved in the dispute. *See Krock v. Lip-*

---

**6.** Because the parties rely exclusively on New York law with respect to all other claims, the only question is what law governs DGI's claim for breach of fiduciary duty. *See Krumme v. Westpoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir.2000) ("The parties briefs assume that New York law controls, and such 'implied consent ... is sufficient to establish choice of law.'") (citing *Tehran–Berkeley Civil & Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton*, 888 F.2d 239, 242 (2d Cir.1989)); *Margo v. Weiss*, No. 96 Civ. 3842, 1998 WL 2558, at *4 (S.D.N.Y. Jan. 5, 1998) (parties exclusive reliance on New York law was sufficient to establish choice of law); *see also Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1540 (2d Cir.1997) (the laws of different jurisdictions may apply to different claims within a given suit).

**7.** DGI's submissions to the Court assume that its breach of fiduciary duty claim is governed by New York law. *See* DGI Mem. at 11–12; Declaration of Bruce A. Green, Expert on Legal Ethics, Ex. 4 to McConnell Aff. On the other hand, the moving parties' submissions assume that Illinois law should govern this claim. *See* J & G's Memorandum of Law in Support of its Motion for Summary Judgment ("J & G Mem.") at 13–19; Daugerdas' Memorandum of Law in Support of its Motions for Summary Judgment ("Daugerdas Mem.") at 15–16.

*say,* 97 F.3d 640, 645 (2d Cir.1996); *Babcock v. Jackson,* 12 N.Y.2d 473, 481–82, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963); *see also Padula v. Lilarn Props. Corp.,* 84 N.Y.2d 519, 521–22, 620 N.Y.S.2d 310, 644 N.E.2d 1001 (1994).

■ A state has a paramount interest in regulating the conduct of attorneys licensed to practice within its borders. *See LNC Invs., Inc. v. First Fidelity Bank, N.A.,* 935 F.Supp. 1333, 1350–51 (S.D.N.Y. 1996); *see also Shaklee Corp. v. Oberman,* No. 91 Civ. 6870, 1993 WL 378268, at *1 (S.D.N.Y. Sept. 20, 1990) (finding that New York had a predominant interest in issues involving legal malpractice allegedly committed by a New York attorney). DGI has repeatedly argued that Daugerdas' duties as DGI's attorney are the "linchpin" of this claim. *See* DGI Mem. at 23; *see also* 9/19/00 Transcript of Hearing ("9/19/00 Tr.") at 14. Daugerdas is a citizen of Illinois who is licensed to practice law in that state. He is not licensed to practice law in New York. DGI is a Delaware corporation with its principal place of business in New York, which at all relevant times maintained an office and transacted business in Illinois. Although New York may have a slight interest in protecting its citizens who engage out-of-state attorneys, this interest is outweighed by Illinois' interest in regulating the conduct of its attorneys.[8] *See LNC Inv.,* 935 F.Supp. at 1351. Accordingly, Illinois law will apply to this claim.[9]

### 2. The Elements of a Breach of Fiduciary Duty Claim

■ In order to assert a successful claim for breach of fiduciary duty, DGI must prove: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) proximately resulting damages. *See Arena Football League, Inc. v. Roemer,* 9 F.Supp.2d 889, 897 (N.D.Ill.1998) (citing *LaSalle Bank Lake View v. Seguban,* 937 F.Supp. 1309, 1324 (N.D.Ill.1996)). It is well established that a fiduciary relationship exists as a matter of law between an attorney and his client. *See Morris v. Margulis,* 307 Ill.App.3d 1024, 241 Ill.Dec. 138, 718 N.E.2d 709, 712 (1999). Thus, the first question that must be addressed is whether DGI had an attorney-client relationship with Daugerdas when it allegedly disclosed the OPS strategy.

### a. The Existence of an Attorney–Client Relationship

The moving parties contend that Daugerdas was solicited by DGI in connection with the OPS to become its "marketing partner." They argue that because DGI did not approach Daugerdas in his capacity as an attorney nor seek any legal advice, an attorney-client relationship was never formed. They further assert that any evidence proving the existence of an attorney-client relationship with respect to tax strategies other than the OPS is irrelevant to this action.

■■ There is no dispute that a formal or written agreement establishing an attorney-client relationship with respect to matters pertaining to the OPS does not exist. However, such an agreement is not a prerequisite to the formation of an attorney-client relationship. *See United States v. Evans,* 113 F.3d 1457, 1465 (7th Cir. 1997); *Sain v. Nagel,* 997 F.Supp. 1002,

---

**8.** While the situs of the alleged breach is unclear, as Daugerdas was employed in Illinois at all relevant times, the Court assumes that any unauthorized disclosures of the OPS occurred in Illinois as well as many other states.

**9.** It is unlikely, in any event, that the application of New York law would result in a different outcome.

1010 (N.D.Ill.1998); *Hoban v. Strata Mktg., Inc.,* No. 91 C 5331, 1991 WL 204965, at *2 (N.D.Ill. Oct. 2, 1991). The formation of an attorney-client relationship "hinges upon the client's [reasonable] belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." *Westinghouse Elec. Corp. v. Kerr–McGee Corp.,* 580 F.2d 1311, 1319 (7th Cir.1978) (internal quotations and citation omitted); *see also Evans,* 113 F.3d at 1465; *Central Die Casting and Mfg. Co. v. Tokheim Corp.,* No. 93 C 7692, 1994 WL 233653, at *2 (N.D.Ill. May 25, 1994). To establish a fiduciary or implied attorney-client relationship, the putative client must show that he submitted confidential information to a lawyer with the reasonable belief that the lawyer was acting as his attorney. *See United States v. Evans,* 954 F.Supp. 165, 167 (N.D.Ill.), *aff'd,* 113 F.3d 1457 (7th Cir.1997); *Hoban,* 1991 WL 204965, at *2; *American Motors Leasing Corp. v. Reid,* No. 87 C 10999, 1989 WL 55085, at *2 (N.D.Ill. May 16, 1989); *Pain Prevention Lab, Inc. v. Elec. Waveform Labs., Inc.,* 657 F.Supp. 1486, 1495 (N.D.Ill.1987). However, it is equally "well settled that the requisite attorney-client relationship is not established when the client seeks business or personal advice, as opposed to legal assistance." *Radiant Burners, Inc. v. American Gas Assoc.,* 320 F.2d 314, 324 (7th Cir.1963); *see also Westinghouse,* 580 F.2d at 1319 (the relationship will "not arise where one consults an attorney in a capacity other than as an attorney").

Prior to DGI's disclosure of the OPS, Haber had engaged Daugerdas to represent DGI as its attorney in connection with tax issues associated with the ALFS. *See* Engagement Agreement. On at least one occasion after Daugerdas was engaged by DGI, Daugerdas rendered legal advice to Haber relating to the ALFS. *See* Comment Letter. Haber has stated that at all times subsequent to the execution of the engagement agreement DGI acted and communicated with Daugerdas under the belief that Daugerdas was its attorney, *see* Haber Aff. ¶¶ 5, 6, and on at least one occasion, Haber represented this belief to a third party. *See* 3/25/98 Letter from Haber to C.G. Kligge, Ex. 21 to McConnell Aff.[10] DGI has also produced several of A & G's invoices billing DGI for "Professional Legal Services rendered." *See* Invoices, Exs. 31, 32, 34 to McConnell Aff.

According to Haber, when he communicated the idea of the OPS to Daugerdas sometime in 1998, Daugerdas agreed to help evaluate the strategy's tax consequences, as well as develop and market the strategy in accordance with their prior practice and the terms of their contractual understanding. *See* Haber Dep. at 41–54. In August 1998, Haber forwarded to Daugerdas a draft of a legal memorandum prepared by Tilevitz, then an attorney engaged by DGI to review and develop tax strategies, addressing the legal and tax implications of the OPS. *See* Draft Memorandum, Ex. 24 to McConnell Aff. A modified draft of this memorandum was forwarded to Daugerdas in May 1999. *See* Draft Memorandum II, Ex. 28 to McConnell Aff. These memoranda were forwarded to Daugerdas to assist him in his provision of legal services associated with the strategy.[11] *See* Haber Aff. ¶ 33.

---

**10.** This letter was copied to Daugerdas.

**11.** The fact that DGI sought legal advice regarding the OPS from various attorneys does not destroy the confidentiality of its communications with Daugerdas. There is no indication that DGI did not expect the same confidentiality to attach to the communications with the other attorneys. *See Bridge Prods. Inc. v. Quantum Chemical Corp.,* No. 88 C 10734, 1990 WL 70857, at *4 (N.D.Ill. Apr. 27, 1990).

Advice relating to the tax consequences of proposed transactions, when rendered by an attorney, is considered legal advice. *See In re Grand Jury Subpoena Duces Tecum,* 731 F.2d 1032, 1037 (2d Cir.1984) (advice rendered by an attorney concerning the tax consequences of alternative employee compensation plans is considered legal advice); *Matter of Federated Dep't Stores, Inc.,* 170 B.R. 331, 354 (S.D.Ohio 1994) (tax planning advice rendered by an attorney is legal advice); *see also In the Matter of Grand Jury Proceedings,* 220 F.3d 568, 571 (7th Cir.2000). DGI has produced sufficient evidence to create a disputed issue of material fact as to whether Haber provided Daugerdas with confidential information relating to the OPS for the purpose of seeking legal advice. Further, in light of the parties' prior dealings, DGI's belief that Daugerdas was acting as its attorney was not objectively unreasonable. Accordingly, I cannot conclude as a matter of law that an attorney-client relationship with respect to matters pertaining to the OPS did not exist. *See Sain,* 997 F.Supp. at 1010 (precluding summary judgment on the issue of whether an implied attorney-client relationship existed because of a disputed issue of material fact).

### b. Breach of Duty

DGI premises its breach of fiduciary duty claim on Daugerdas' alleged duties of confidentiality and loyalty. DGI asserts that Daugerdas, as its attorney, breached these duties by disclosing and marketing the OPS to his clients without fairly compensating DGI or obtaining its consent. *See* DGI Compl. ¶¶ 26–29.

American jurisprudence has long recognized the central importance of the attorney-client relationship.

There are few of the business relations of life involving a higher trust and confidence than those of attorney and client or, generally speaking, one more honorably and faithfully discharged; few more anxiously guarded by the law, or governed by sterner principles of morality and justice; and it is the duty of the court to administer them in a corresponding spirit, and to be watchful and industrious, to see that confidence thus reposed shall not be used to the detriment or prejudice of the rights of the party bestowing it.

*Stockton v. Ford,* 52 U.S. (11 How.) 232, 247, 13 L.Ed. 676 (1850). Arising from this principle are the duties of confidentiality and loyalty, which are imposed upon attorneys "to fortify the client's trust placed with the attorney and to ensure the public's confidence in the legal system as a reliable and trustworthy means of adjudicating controversies." *Douglas v. DynMcDermott Petroleum Operations Co.,* 144 F.3d 364, 370 (5th Cir.1998); *see also Maritrans GP Inc. v. Pepper, Hamilton & Scheetz,* 529 Pa. 241, 602 A.2d 1277, 1282– 1285 (1992).

The ethical duty of confidentiality imposed upon attorneys goes beyond the limited evidentiary, attorney-client privilege. *See Isaacson v. Keck, Mahin & Cate,* No. 92 C 3105, 1993 WL 34738, at *1 (N.D.Ill. Feb. 9, 1993); *People v. Curry,* 1 Ill.App.3d 87, 272 N.E.2d 669, 672 (1971). The rule of confidentiality, as the courts have described it, applies not only during judicial proceedings, but at all times, and to client "secrets" as well as "confidences." *See Profit Mgmt. Dev., Inc. v. Jacobson, Brandvik and Anderson, Ltd.,* 309 Ill. App.3d 289, 242 Ill.Dec. 547, 721 N.E.2d 826, 835 (1999); *In re Marriage of Decker,* 153 Ill.2d 298, 180 Ill.Dec. 17, 606 N.E.2d 1094, 1102 (1992); *see also Curry,* 272 N.E.2d at 672. The rule is codified in Rule 1.6 of the Illinois Rules of Professional Conduct, which provides in relevant part:

(a) Except when required under Rule 1.6(b) or permitted under Rule 1.6(c), a lawyer shall not, during or after termination of the professional relationship with the client, use or reveal a confidence or secret of the client known to the lawyer unless the client consents after disclosure.

The Preamble to the Illinois Rules of Professional Conduct defines a "confidence" and "secret" as follows:

"Confidence" denotes information protected by the lawyer-client privilege under applicable law.

"Secret" denotes information gained in the professional relationship, that the client has requested be held inviolate or the revelation of which would be embarrassing to or would likely be detrimental to the client.

Intertwined with the rule of confidentiality is the duty of loyalty, which is codified in Rule 1.9 of the Illinois Rules of Professional Conduct:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter:

. . . . .

(2) use information relating to the representation to the disadvantage of the former client, unless:

(A) such use is permitted by Rule 1.6; or

(B) the information has become generally known.

Rule 1.9 protects more than just "confidences" or "secrets." It protects any information relating to the representation in question used to the disadvantage of a former client as long as that information is not generally known.

### i. The OPS—A "Confidence" or "Secret"

DGI does not contend that Daugerdas was prohibited from disclosing the OPS to third parties. Instead, DGI argues that Daugerdas was obligated to share any economic benefits he received from doing so. *See* Haber Dep. at 130–31. Haber himself disclosed the OPS to various people, including prospective clients, professionals, accounting firms, and law firms. *See id.* at 124–25. While these entities were advised by DGI that they should treat the OPS as confidential, they were not required to sign a confidentiality agreement. *See id.* Because of DGI's disclosure and marketing efforts with respect to the OPS, the moving parties argue that the strategy cannot be classified as either a client "confidence" or "secret." [12]

12. The moving parties spend a great deal of time arguing that the OPS was not "novel" at the time it was allegedly disclosed and therefore any claim of idea misappropriation must fail. *See* J & G Mem. at 9–13; Daugerdas Mem. at 16–20. While this may be true, DGI's Complaint does not allege a claim for idea misappropriation. DGI has repeatedly represented to the Court that its breach of fiduciary claim is based upon Daugerdas' alleged duties of confidentiality and loyalty arising from his role as DGI's attorney. *See* 9/19/00 Tr. at 14 (the "linchpin" of this claim is the relationship between Haber and Daugerdas, "a relationship imbued with clear understandings ... between a lawyer and a client as well [as] an understanding between a client and a lawyer who was undertaking to do other things by way of marketing."); DGI Mem. at 15, 23 (stating that "[i]n light of the higher fiduciary duties incumbent upon an attorney in dealing with business secrets and confidences of his client, [DGI] believe[s] that the effort of [the moving parties] to claim summary judgment upon principles of idea misappropriation are simply beside the point."). If in fact the OPS is not novel, in the public domain, and neither a "confidence" nor "secret," for the reasons set forth in Section III.A.2.b.ii., *infra*, Daugerdas may still be liable for breach of fiduciary duty. Finally, for the reasons discussed in that section, novelty will not be an issue in the breach of fiduciary duty claim, DGI's only remaining claim.

 In order to be classified as a client "confidence" the information disclosed must fall under the protection of the attorney-client privilege. The Seventh Circuit has summarized the attorney-client privilege as follows:

> (1) Where legal advice of any kind is sought (2) from a professional legal adviser in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal adviser, (8) except the protection be waived.

*Evans,* 113 F.3d at 1461 (quoting 8 John Henry Wigmore, *Evidence in Trials at Common Law* § 2292 (John T. McNaughton rev.1961)). Any disclosure of a confidential communication by a client is inherently inconsistent with the policy of facilitating a confidential attorney-client relationship and therefore, results in a waiver of the privilege. *See Profit Mgmt.,* 242 Ill.Dec. 547, 721 N.E.2d at 835; *see also Central Die Casting,* 1994 WL 233653, at *2 (the privilege is limited to those communications which were either expressly made confidential, or which the client could reasonably believe under the circumstances would be understood by the attorney as such).

 As DGI intentionally disclosed the OPS to third parties, any protection under the attorney-client privilege was waived, and therefore it can no longer be considered a client "confidence." *See Profit Mgmt.,* 242 Ill.Dec. 547, 721 N.E.2d at 835 (once the privilege is waived the communication can no longer be considered confidential). Nor can the OPS be considered a client "secret" because Haber permitted Daugerdas to reveal the OPS to prospective clients, albeit for a fee.

### ii. Information Pertaining to the OPS

 However, this does not end the inquiry into Daugerdas' ethical obligations. As noted above, Haber provided Daugerdas with drafts of legal memoranda prepared by Tilevitz addressing the legal and tax implications of the OPS in an effort to assist him in evaluating the legal implications of the strategy. *See* Draft Memoranda, Exs. 24, 28 to McConnell Aff.; Haber Aff. ¶ 33. Haber also forwarded marketing materials relating to the strategy to Daugerdas, along with a cover sheet stating: "Even though I often act as a tax attorney, I truly rely on you for your technical expertise. Please make your changes and fax them back to me." *See* Financial Instrument Trading Strategy, Ex. 23 to McConnell Aff.

While the OPS may not be a client "confidence" or "secret," one of the fundamental principles of the attorney-client relationship is an attorney's duty to maintain the confidentiality of information relating to the representation of his client. *See Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715, 721 (7th Cir.1982); *see also Chemical Waste Mgmt. v. Sims,* 875 F.Supp. 501, 503 (N.D.Ill.1995). This principle is expressly recognized by Rule 1.9 of the Illinois Rules of Professional Conduct, which states that an attorney must not "use information relating to the representation to the disadvantage of [his] former client" unless that information is generally known. Ill. RPC 1.9; *see also Healy v. Axelrod Constr. Co. Defined Benefit Pension Plan And Trust,* 155 F.R.D. 615, 620 (N.D.Ill.1994).

Assuming an attorney-client relationship existed, the scope of the representation included the evaluation of legal issues associated with the OPS. DGI has alleged that Daugerdas has, and continues to utilize information relating to his representation—namely the Tilevitz memoranda—to market the OPS to the detriment of DGI.[13]

---

**13.** By marketing the OPS to his clients, Dau-

gerdas has allegedly become a competitor of

In his deposition, Daugerdas admitted to using parts of the Tilevitz memoranda in the opinion he is currently using to market the OPS. *See* Daugerdas Dep. at 270–82. The materials submitted to the Court by DGI also indicate that Daugerdas copied substantial parts of the Tilevitz memoranda verbatim.[14] *See* Comparison of Memoranda, Ex. 37 to McConnell Aff.

This evidence is sufficient to create a disputed issue of material fact with respect to Daugerdas' alleged breach of fiduciary duty.[15] Accordingly, the moving parties' motions for summary judgment with respect to DGI's breach of fiduciary duty claim are denied.[16]

## B. Breach of Contract

Count II of DGI's Complaint alleges that Daugerdas violated the terms of their "contractual understanding" by (1) failing to refer potential clients who might have benefitted from the OPS to DGI; and (2) implementing the OPS for such clients to the exclusion of DGI. The moving parties argue that enforcement of this alleged contract is barred by the Statute of Frauds, or in the alternative, void for lack of consideration. Because the alleged contract is barred by the Statute of Frauds, I do not address the issue of consideration.

### 1. Statute of Frauds

■ Although parties are "free to enter into a binding contract without memorializing their agreement in a fully executed document[,]" *Winston v. Mediafare Entm't Corp.*, 777 F.2d 78, 80 (2d Cir. 1985), New York law requires certain agreements to be in writing. The New York Statute of Frauds provides, in pertinent part:

a. Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking:

1. By its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime . . . .

N.Y. Gen. Oblig. Law § 5–701(a)(1) (McKinney 2000).

Under the terms of the alleged oral contract, once Daugerdas agreed to help DGI evaluate and develop a tax strategy, he was prohibited from marketing that strategy to prospective clients or participating in transactions involving that strategy without fairly compensating DGI or obtaining its consent. *See* Haber Dep. at 33–37, 47, 122; Haber Aff. ¶ 22. If Daugerdas decided to implement the OPS for his clients, any economic benefits he derived were to be shared equally with DGI. *See* Haber Aff. ¶ 21; Haber Dep. at 111–113. In return, DGI promised to make all

DGI.

14. Although the circumstances are in dispute, in late 1998 and early 1999, DGI and Daugerdas worked together on the "BESICORP" transaction—a transaction employing the OPS. *See* Haber Aff. ¶ 23; Haber Dep. 49–50. In connection with this transaction, Tilevitz reviewed a draft opinion prepared by Daugerdas. *See* Tilevitz Aff. ¶ 25. Tilevitz found the opinion lacking in certain areas, and at the direction of Haber, forwarded to Daugerdas his latest memorandum on the OPS for use in

the opinion. *See id.* At the time, Tilevitz believed Daugerdas was working for DGI. *See id.*

15. Based on the record before the Court, I cannot conclude that the information included in the Tilevitz memoranda or the marketing materials provided to Daugerdas were "generally known."

16. Whether DGI suffered any damages as a result of the alleged breach is not at issue in this motion.

of its clients aware that Daugerdas' firm was willing to render an opinion letter on the correct tax treatment of their transaction. *See* Haber Dep. at 37. Haber testified that Daugerdas was "forever" obligated under the terms of this contract. *See id.* at 132. Daugerdas could not terminate the contract at will, nor did the contract contain a termination provision. *See id.* at 115, 122.

It is well settled that the "touchstone of an inquiry under Section 5–701(a)(1) is . . . whether the contract by its terms is incapable of performance within one year, because the agreement places indefinite liability on the defendant." *Day, II v. Meyer,* No. 99 Civ. 10708, 2000 WL 1357499, at *5 (S.D.N.Y. Sept. 19, 2000); *see also Zupan v. Blumberg,* 2 N.Y.2d 547, 550, 161 N.Y.S.2d 428, 141 N.E.2d 819 (1957) (" 'The endurance of defendant's liability is the deciding factor.' ") (quoting *Martocci v. Greater New York Brewery,* 301 N.Y. 57, 63, 92 N.E.2d 887 (1950)). Oral contracts containing restrictive covenants not capable of being performed within one year fall under this provision. *See Innovative Networks, Inc. v. Young,* 978 F.Supp. 167, 179–80 (S.D.N.Y.1997) (restrictive covenant unenforceable under the one year provision of the Statute of Frauds), *aff'd sub nom., Innovative Networks Inc. v. Satellite Airlines Ticketing Ctrs., Inc.,* 152 F.3d 918 (2d Cir.1998); *see also Queens Group, Inc. v. Martin Packaging Corp.,* 245 A.D.2d 183, 666 N.Y.S.2d 593, 594 (1st Dep't 1997) ("[P]urported oral continuation of the restrictive covenant . . . is not viable since by its terms the restrictive covenant is not capable of performance within one year.").

In an attempt to evade the writing requirement, DGI asserts that (1) the oral agreement could be terminated by either party at any time; and (2) Daugerdas is prohibited from invoking the Statute of Frauds to avoid the consequences of an oral agreement with a client. DGI is wrong on both counts.

*First,* DGI's argument that Daugerdas could terminate the agreement by "deciding that he would no longer issue opinions supportive of the [OPS]" misses the point. DGI Mem. at 22. "The question is not what the probable, or expected, or actual performance of the contract was, but whether the contract, according to the reasonable interpretation of its terms, required that it should not be performed within the year." *Radio Corp. of Am. v. Cable Radio Tube Corp.,* 66 F.2d 778, 784 (2d Cir.1933) (internal quotations and citation omitted). When the terms of the contract are such that the relationship will continue beyond a year, it is covered by the Statute of Frauds, regardless of whether the continuing liability to which the defendant is subject is a contingent one. *See Rosenthal v. Kingsley,* 674 F.Supp. 1113, 1123 (S.D.N.Y.1987); *Grissman v. Union Carbide Corp.,* 279 F.Supp. 413, 416 (S.D.N.Y.1967); *Martocci,* 301 N.Y. at 63, 92 N.E.2d 887. Thus, whether or not Daugerdas could refrain from issuing opinions for transactions utilizing the OPS is irrelevant to the Statute of Frauds analysis.

*Second,* there is no blanket rule prohibiting attorneys from asserting a Statute of Frauds defense for a breach of contract claim. The two cases relied on by DGI, *Hawkins v. Dunmore,* 24 Misc. 623, 54 N.Y.S. 165 (1898) and *Ford v. Harrington,* 16 N.Y. 285 (1857), are inapposite. In both cases, the courts, relying on the specific circumstances involved, found that the Statute of Frauds could not be invoked by attorneys who entered into transactions with their clients for grossly inadequate consideration.[17] These cases do not stand

---

**17.** In *Harrington,* the court was faced with a situation where a client was taken advantage of by his attorney in a transaction involving

for the proposition that DGI, a sophisticated corporation engaged in the business of marketing tax strategies, can avoid the Statute's writing requirement for a permanent marketing agreement allegedly entered into with its attorney. To allow DGI to do so would defeat the primary purpose of the Statute—protecting parties from being bound to agreements they never made. *See Ohanian v. Avis Rent–A–Car System, Inc.*, 779 F.2d 101, 106 (2d Cir.1985) ·("It has long been held that the purpose of the statute is to raise a barrier to fraud when parties attempt to prove certain legal transactions that are deemed to be particularly susceptible to deception, mistake, and perjury."); *City of Yonkers v. Otis Elevator Co.*, 649 F.Supp. 716, 726 (S.D.N.Y.1986) (the Statute was designed to prevent "frauds and perjuries").

In light of these circumstances, DGI will not be permitted to rescue an unenforceable oral agreement by invoking the attorney-client relationship. Accordingly, DGI's breach of contract claim is dismissed.

## C. Unjust Enrichment

Count III of DGI's Complaint alleges that (1) Daugerdas benefitted from DGI's development of the OPS in a manner that constituted a breach of confidences obtained in the course of an attorney-client relationship; and (2) Daugerdas received a substantial economic benefit as a result of his use of the OPS. *See* DGI Compl. ¶¶ 36–37. Under these circumstances, DGI asserts that it would be unjust for Daugerdas to retain such benefit. *See id.* ¶¶ 38–40.

■ In its brief, DGI asserts that its claim for unjust enrichment is "based not only upon the oral agreement, but upon the attorney-client relationship which gave the agreement its shape and meaning." DGI Mem. at 22. To state a claim for unjust enrichment, a plaintiff must plead that: (1) the defendant has been unjustly enriched; (2) the enrichment was at the plaintiff's expense; and (3) the defendant's retention of the benefit would be unjust. *See Ellis v. Provident Life & Accident Ins. Co.*, 3 F.Supp.2d 399, 411 (S.D.N.Y.1998).

■ There is no need here to analyze these elements. *First*, to the extent that this claim is based on the alleged oral agreement, it is barred by the Statute of Frauds. *See Abrams v. Unity Mutual Life Ins. Co.*, 70 F.Supp.2d 846, 853 (N.D.Ill.1999) (a plaintiff may not circumvent the statute of frauds by claiming unjust enrichment); *see also American–European Art Assocs., Inc. v. Trend Galleries, Inc.*, 227 A.D.2d 170, 641 N.Y.S.2d 835, 836 (1st Dep't 1996); *Tallini v. Bus. Air, Inc.*, 148 A.D.2d 828, 538 N.Y.S.2d 664, 666 (3rd Dep't 1989) ("[P]laintiff's claim that he was denied commissions which he was entitled to under a theory of unjust enrichment depends on proof of the oral contract and therefore is ... barred by the Statute of Frauds."). *Second*, DGI's Complaint already alleges a claim for breach of fiduciary duties based on an alleged attorney-client relationship. Any damages accruing as a result of the alleged breach may be recovered under the breach of fiduciary duty claim.

the conveyance of land. *See* 16 N.Y. 285. In *Hawkins,* the court held that an attorney could not invoke the Statute of Frauds as a defense in an action brought by his client to enforce an agreement to reconvey lands, where the result would be "so inequitable, and so far a fraud upon [the client's] rights...." 54 N.Y.S. at 167.

Thus, to the extent DGI's claim for unjust enrichment is based upon Daugerdas' alleged breach of fiduciary duties, this claim is duplicative. For these reasons, DGI's claim for unjust enrichment is dismissed.

### D. Remedies—Constructive Trust and Injunctive Relief

Counts IV and V of the Complaint seek a constructive trust over all profits Daugerdas received from using the OPS and an injunction barring Daugerdas from any further use of the OPS.

A constructive trust is an equitable remedy under New York law, designed to "prevent unjust enrichment, although unjust enrichment does not necessarily implicate the performance of a wrongful act." *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 361 (2d Cir. 1999). New York law identifies four elements of a constructive trust: (1) a confidential or fiduciary relationship; (2) a promise; (3) a transfer in reliance thereon; and (4) unjust enrichment. *See Pagliai v. Del Re*, No. 99 Civ. 9030, 2001 WL 220013, at *6 (S.D.N.Y. Mar. 7, 2001). While these elements serve as important guideposts, the constructive trust doctrine is equitable in nature and should not be rigidly limited. *See id.* Because DGI's request for a constructive trust rests upon its breach of fiduciary duty claim which involves disputed issues of material fact, summary judgment with respect to this request is denied.[18]

DGI's request for injunctive relief is premature, as no wrongful conduct by Daugerdas has yet been proved. In addition, DGI is not seeking a preliminary injunction.

## IV. CONCLUSION

For the foregoing reasons, the moving parties' motions for summary judgment are granted in part and denied in part.[19] Summary judgment is granted in the moving parties' favor on DGI's breach of contract and unjust enrichment claim. Accordingly, these claims are dismissed. Summary judgment is denied as to DGI's breach of fiduciary duty claim. A conference is scheduled for April 13, 2001 at 4:00 p.m.

---

18. The dismissal of DGI's unjust enrichment claim on the ground that it is duplicative of its breach of fiduciary duty claim does not foreclose the possibility of imposing a constructive trust.

19. J & G's Complaint requests that this Court vindicate its rights implicated in the first action by declaring that: (1) J & G, via Daugerdas or otherwise, had no contractual obligation to refer clients to DGI; (2) J & G was never obligated to refer clients to DGI; and (3) the OPS allegedly disclosed to Daugerdas was not confidential. In accordance with the rulings above, J & G's first two requests are granted. However, to the extent that J & G's rights are implicated by DGI's breach of fiduciary claim, J & G's third request is denied.